UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Criminal No. 12-11-ART-(1) |
| ) | |
| v. ) | |
| ) | **MEMORANDUM** |
| RAY DOUGLAS STAPLETON, ) | **OPINION AND ORDER** |
| ) | |
| Defendant. ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

Ray Stapleton is charged with enabling prescription drug abuse, an all too common tragedy in Kentucky. He owns a clinic at which doctors allegedly issued hundreds of medically baseless prescriptions, feeding the so-called patients' addictions and putting the public at risk. The government wants to introduce an expert to help explain to the jury why those prescriptions were illegitimate. Stapleton moved to exclude the expert testimony. The government has already agreed not to introduce some of the expert testimony that Stapleton objects to, and the rest of his objections lack merit. So, what remains of his motion in limine will be denied.

## BACKGROUND

Ray Stapleton and his codefendants are charged with various drug crimes, including conspiring to illegally distribute oxycodone and other controlled substances. It all started when Kentucky police arrested Stapleton for driving under the influence. R. 111 at 4–5. Officers searched his car and found over a million dollars in cash and thousands of pills. *Id.* at 10. The trail of evidence eventually led the police to the pain clinic that Stapleton and his

wife owned and operated. *Id.* The government says the Stapletons' pain clinic was the hub of a large drug conspiracy where two doctors issued a high volume of medically baseless prescriptions. *Id.* at 1. These doctors, Dr. Stephen Arny and Dr. Emmanuel Acosta, were employees of the Stapletons. All four now stand accused of flooding their community with dangerously powerful and addictive drugs. *Id.*

To prove that the defendants knowingly distributed unnecessary prescriptions, the government seeks to introduce Dr. D. Paul Harries, a pain specialist, as an expert. His proposed testimony boils down to one basic conclusion: Dr. Arny's and Dr. Acosta's prescriptions were not the product of genuine medical treatment. On the way to this bottom line, Dr. Harries forms two crucial opinions. First, the doctors did not comply with the relevant medical standards for treatment and documentation. And second, the pace, volume, and mix of their prescriptions have no legitimate medical purpose. Dr. Harries' opinions were initially developed in two reports he prepared at the request of the Kentucky Board of Medical Licensure. *See* R. 140-2 (Dr. Arny); R. 140-3 (Dr. Acosta). The reports analyze each doctor's respective treatment records. Based on those records, Dr. Harries finds large departures from medical norms that suggest illegal drug dealing. Relying on Dr. Harries's written reports, Ray Stapleton objects that his expert testimony is inadmissible. R. 45. In particular, Stapleton argues that: 1) Dr. Harries' testimony would run afoul of Rules 702 and 703 of the Federal Rules of Evidence, *id.* at 2–4; 2) Dr. Harries' opinions address ultimate legal issues properly left for the jury, *id.* at 3; 3) the government has failed to identify with sufficient specificity the data upon which Dr. Harries bases his expert opinions, *id.* at 4–5; and 4) the government has failed to provide defense counsel with that data, *id.* at 5–6. The Court held a *Daubert* hearing on July 2, 2013. *See* R. 139.

At the *Daubert* hearing, the government addressed a number of Stapleton's concerns. Counsel for the United States agreed that Dr. Harries would steer clear of almost all the contested words or phrases potentially expressing legal conclusions. *See* R. 142 at 97, 100–101. In addition to these concessions, the United States clarified that it seeks only to introduce some of the conclusions described in Dr. Harries's written reports, not the reports themselves. *Id.* at 97; *see also Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 728 (6th Cir. 1994) ("Rule 702 permits the admission of expert opinion *testimony*[,] not opinions contained in documents prepared out of court."). With the most potentially troublesome conclusions off the table, Dr. Harries' testimony is admissible because Stapleton's remaining objections lack merit. Dr. Harries is qualified to opine on the topics specifically identified by the government at the *Daubert* hearing, namely: 1) whether the defendants' documentation and procedures satisfy medical standards and suggest an authentic doctor-patient relationship, and 2) whether their prescription patterns have a legitimate medical purpose. Finally, the government has fully satisfied its discovery obligations. The remainder of Stapleton's motion is accordingly denied.

## DISCUSSION

### I.  Dr. Harries' Testimony Does Not Improperly Address "Ultimate Issues."

Experts do not have free reign to opine on all "ultimate issues" to be decided by the jury. To be sure, Federal Rule of Evidence 704(a) provides that opinion testimony "is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Other rules, however, may still bar such testimony. For example, Rules 701 and 702 require that opinions be helpful to the trier of fact. *See* Fed. R. Evid. 704 Advisory Committee Notes. As a result, "testimony offering nothing more than a legal conclusion—i.e[.], testimony that

does little more than tell the jury what result to reach—is properly excludable under the Rules." *Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997).

Stapleton argues that many of the opinions in Dr. Harries's written reports cross this line. He specifically objects to the following words and phrases: "negligence," "unacceptable," "legalized drug dealing," "beyond that of gross negligence," "reckless indifference," "wanton indifference," "imminent danger," "criminal activity," and "Pill Mill." R. 45 at 4. Stapleton further asserts that such testimony would result in the improper introduction of character evidence. *Id.*

Counsel for the United States agreed at the *Daubert* hearing that Dr. Harries will avoid all of the terms on Stapleton's list except "unacceptable." Dr. Harries intends to testify that Dr. Acosta's failure to document the medical necessity of his prescriptions is "unacceptable" for a physician. *See* R. at 140-3 at 2. Put in context, this word encompasses no more than the conclusion that Dr. Acosta's documentation failed to comport with sound medical practice. As used by Dr. Harries, "unacceptable" has no legal connotation, nor does it "tell the jury what result to reach." *Woods*, 110 F.3d at 1219. Stapleton's objection to the word "unacceptable" is accordingly rejected.

The Court need not analyze the remaining terms on Stapleton's list. Based on the government's concession, Dr. Harries will steer clear of terms that might have legal connotations or potentially suggest a judgment of guilt. Stapleton's objections to the remaining terms are therefore moot.

II. **Dr. Harries' Testimony Is Admissible Under Federal Rule of Evidence 702.**

Rule 702 of the Federal Rules of Evidence charges the Court with a "'gatekeeping role' in screening the reliability of expert testimony." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d

665, 668 (6th Cir. 2010) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). Expert testimony satisfies Rule 702 only if it meets three requirements: (1) the witness is qualified by "knowledge, skill, experience, training, or education"; (2) the expert's testimony is relevant, meaning that "it 'will assist the trier of fact to understand the evidence or to determine a fact in issue'"; and (3) the testimony is reliable. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008) (quoting Fed. R. Evid. 702). As the proponent of the expert testimony, the government must establish its admissibility by a preponderance of the evidence. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10).

Even though Stapleton does not address the reliability of Dr. Harries's testimony, the Court's duty as gatekeeper remains. *See United States v. Thomas*, 223 F. App'x 447, 457 (6th Cir. 2007) (noting that even when an expert opinion is unopposed, it is error not to conduct *Daubert* analysis). The Court is satisfied that Dr. Harries meets the requirements of Rule 702.

**Dr. Harries's Credentials:** Dr. Harries is qualified to testify as an opinion witness in this case. In light of the government's concessions, Dr. Harries's proposed testimony will be limited to medical legitimacy and professional standards. Both subjects are well within his area of expertise. Since he decided not to press the issue in his briefs or at the *Daubert* hearing, Stapleton has offered no basis for questioning Dr. Harries's qualifications—with good reason. Dr. Harries's qualifications are impressive. He received his medical degree in 1986 from the University of Wales College of Medicine in Cardiff, Great Britain. *See* R. 140-1 at 1. After training overseas for more than a decade, he completed a four-year residency in 2003 with the University of Kentucky Department of Physical Medicine and

Rehabilitation. *Id.* Dr. Harries is a board certified specialist in pain medicine with a master's degree in that specialty. *Id.* Since his residency, Dr. Harries' practice has focused exclusively on pain treatment. *Id.* He now maintains a solo pain practice, Hamburg Pain, in Lexington, Kentucky. *Id.*

Dr. Harries's extensive training and experience qualify him to testify to the medical necessity of a course of treatment for pain, including any prescriptions. First, his education and board certification in pain treatment indicate he has ample knowledge to assess whether a pattern of prescriptions is within a normal range or is otherwise an outlier. Second, Dr. Harries is a practicing pain specialist and has spent his entire career as an independent physician—nearly a decade—in that specialty. *See id.* As he testified, his current practice at Hamburg Pain routinely involves prescription treatment. *See* R. 142 at 12 ("[W]e pretty much do everything for pain management, from pharmacology to pumps."). Dr. Harries's day-to-day experience confirms he has a sufficient knowledge base. He has seen more than enough patients to comment on typical cases and appropriate prescription treatment.

Dr. Harries is also qualified to testify as to whether a given set of medical records suggests a genuine doctor-patient relationship. He is familiar with the relevant standards of treatment and recordkeeping, since he complies with those standards every day as a practicing pain specialist. The standards vary in part by specialty: Basic standards of treatment and documentation apply to all doctors, while certain additional standards apply only to doctors treating pain. *See id.* at 14, 19–20, 47–48, 50, 67. As a physician, Dr. Harries is qualified to testify as to whether Drs. Arny and Acosta met the lowest common denominator. *See id.* at 14. And, as to pain-specific treatment standards, Dr. Harries regularly applied in his own practice the same guidelines governing Dr. Arny and Dr. Acosta

6

during the conduct in question. His practical experience suggests he understands the treatment and documentation standards for pain specialists and what it takes to satisfy them. Because Dr. Harries knows what doctors generally, and pain specialists specifically, should do, he is qualified to opine whether Dr. Arny and Dr. Acosta met the relevant standards.

**The Relevance of Dr. Harries's Testimony:** Because Dr. Harries's testimony "will assist the trier of fact to understand the [medical legitimacy of the defendants' prescriptions]," it is relevant for the purposes of Rule 702. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d at 528–29 (defining relevance in the *Daubert* context). Put yourself in the mind of a typical juror. You have been to the doctor and received prescriptions numerous times, but you have no more than a superficial knowledge of how the doctor develops and documents your treatment. You do not have the foggiest idea of how he should treat all his other patients, and you would not know this even if you had their medical records. That goes double for powerful prescription drugs, since they are prescribed less often, and you might never encounter them in your daily life. For this reason, opinion testimony from physicians is generally permissible in controlled substances cases. *United States v. Kirk*, 584 F.2d 773, 785 (6th Cir. 1978). This specifically includes testimony "to establish the 'generally acceptable standards of medical practice for issuing prescriptions.'" *United States v. Hughes*, 895 F.2d 1135, 1144 (6th Cir. 1990) (quoting *Kirk*, 584 F.2d at 785) (internal quotations omitted)); *see also United States v. Word*, 806 F.2d 658, 663 (6th Cir. 1986) ("[E]xpert testimony as to legitimate medical purpose and in the usual course of professional practice may be helpful to a jury . . . ." (internal quotation marks omitted)). Because these standards are beyond the ken of the typical juror, Dr. Harries's testimony will prove helpful to the jury in this case. It is thus relevant under Rule 702.

**The Reliability of Dr. Harries's Testimony:** Before assessing the reliability of Dr. Harries's opinion, it is crucial to understand his basic method. The bottom line of his testimony is that Dr. Arny's and Dr. Acosta's prescriptions do not reflect genuine medical treatment. To reach this conclusion Dr. Harries makes two comparisons. First, he compares the doctors' documentation practices to the medical standards governing doctors generally, and pain specialists specifically. Second, he compares the doctors' prescription patterns to what one would expect for a typical doctor in their shoes. Finding the doctors' conduct drastically different from medical norms on both counts, Dr. Harries ultimately concludes that their prescriptions are not backed by a genuine doctor-patient relationship or legitimate medical purpose.

To satisfy Rule 702, both Dr. Harries's methods and his conclusions must be reliable. In judging the reliability of his methods, the Court primarily looks to the *Daubert* factors. *See* 509 U.S. at 593–94. But not every factor applies in each case. *See Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 295 (6th Cir. 2007) (holding that the Court's "gatekeeping inquiry is context-specific and must be tied to the facts of a particular case" (quotation omitted)). Only three are relevant here. Two come directly from *Daubert* itself: the risk of error in the expert's method and the general acceptance of that method in the appropriate field. *See* 509 U.S. at 593–94. The last does not come from *Daubert*, but from the Sixth Circuit: whether the expert's findings came out of his independent research or were prepared for the purposes of litigation. *See Smelser v. Norfolk S. Ry.*, 105 F.3d 299, 303 (6th Cir. 1997). Even if Dr. Harries's methods are reliable, however, the Court must also ensure that his conclusions reasonably follow from his methods. *See Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010) (rejecting an expert's conclusions as too

8

speculative and attenuated). In other words, Dr. Harries's opinions must be the product of a reliable *application* of an otherwise acceptable method. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[C]onclusions and methodology are not entirely distinct from one another. . . . A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

Dr. Harries's overall method is reliable in theory. His comparative approach is intuitive: Where there is smoke, there is fire. Here, the smoke is sub-standard recordkeeping and an abnormal pace, volume, and mix of strong prescriptions. This reasonably suggests fire: the lack of a genuine treating relationship supported by a legitimate medical purpose. It is hard to quibble with this straightforward logic. What matters then is the reliability of each step in Dr. Harries's analysis. First, Dr. Harries needs a reliable baseline for comparison that reflects what one would expect for doctors such as Dr. Arny and Dr. Acosta. Then he needs a reliable assessment of the defendants' actual treatment and documentation practices. Finally, his conclusions must be at least plausibly supported by a gap between the expected and the actual.

Well-accepted documentation and treatment standards applying to pain specialists are a reliable baseline for Dr. Harries's comparisons. Dr. Harries first draws on best practices inherent in "the basic practice of medicine," common to all doctors. *See* R. 142 at 47–48, 50. All physicians must, for example, examine patients, discuss their symptoms, come to at least an initial diagnosis, establish a treatment plan, and document all of the above. *Id.* at 14, 19–20, 50, 67. Since these practices are universal, it is reliable to conclude that their regular absence suggests the lack of a sincere treating relationship. Dr. Harries also draws on standards specifically governing pain specialists. For example, he applies the Kentucky

9

Board of Medical Licensure's current guidance on the use of controlled substances in pain treatment. *Id.* at 46–48. Among its provisions, that guidance requires a complete medical history, evaluation of the nature and intensity of pain, consideration of alternatives to addictive drugs, a written treatment plan, an addiction risk assessment, and extensive documentation. *See* R. 140-4.[1] Developed by peer doctors, the Kentucky Board's opinion is by definition generally accepted among the pain medicine community. Since Dr. Acosta and Dr. Arny are expected to follow the standards applying to their specialty, their consistent failure to do so reasonably suggests the absence of genuine medical treatment. Dr. Harries's baseline for evaluating the defendants' treatment and documentation practices is thus reliable.

Dr. Harries's experience as a board-certified pain specialist is also a reliable basis for defining a normal range of treatment against which he may compare the defendants' prescription patterns. Dr. Harries may draw on his medical training to identify typical ailments and reasonable treatments for those ailments because that is the bread and butter of his pain practice. In nearly a decade spent treating pain, Dr. Harries has seen many patients. His practice thus serves as a large, and likely representative, sample of Kentucky patients. As a result, it is reliable to use his own treatment pace, volume, and mix as the baseline against which to compare those of Dr. Arny and Dr. Acosta. If there is a substantial difference between his practices and the doctors' practices, it is sound to conclude that a legitimate medical purpose does not support the defendants' prescriptions.

---

[1] This guidance remains unchanged today. *See Opinion Regarding the Use of Controlled Substances in Pain Treatment*, Kentucky Board of Medical Licensure (October 10, 2008), available at http://www.kbml.ky.gov/NR/rdonlyres/B0538843-6E6D-48B2-B67B-A5D0E6C37C77/0/BoardOpinionUseofControlledSubstances.pdf, accessed July 12, 2013. The opinion lists when it has been modified since its original adoption. It appears this version was current at the time of Dr. Harries' review.

Like his baselines, Dr. Harries's assessments of Dr. Arny's and Dr. Acosta's conduct are also reliable. As Dr. Harries testified at the *Daubert* hearing, he based his opinions largely on the doctors' medical charts and records of treatment. These sources are universally accepted across medicine and are plainly reliable. One potential problem: Dr. Harries reviewed only a sample of the defendants' charts, provided by the Kentucky Medical Board. Dr. Harries acknowledged that the Medical Board's process of selecting charts for review might not always produce a representative sample. In other words, there is a chance in a given case that the charts do not paint an accurate picture of a doctor's overall treatment patterns. They might reflect only extreme or unusual cases. An unrepresentative sample would make Dr. Harries's conclusions unreliable. However, Dr. Harries strongly dismissed that possibility in this case.

In light of Dr. Arny's and Dr. Acosta's comprehensive treatment record, the risk of an unrepresentative sample is quite small. Dr. Harries testified that based on each doctor's Kentucky All Schedule Prescription Electronic Reporting ("KASPER") reports, their full prescription history corroborates his findings. KASPER monitors all prescriptions dispensed within the state. A KASPER report shows a doctor's entire prescription record. The sample charts, Dr. Harries explained, reflect the defendants' "typical case mix," and, with rare exception, follow "exactly the pattern . . . in the KASPER for every patient." R. 142 at 41–42. The chart sample was thus a fair cross-section of their full treatment histories. Having eliminated the risk of an unrepresentative sample, Dr. Harries' assessments are sound because they are based on evidence fairly reflecting Dr. Arny's and Dr. Acosta's entire documentation and prescription record. To the extent there is any remaining doubt surrounding the representativeness of Dr. Harries's sample, the defendants are free, of

11

course, to raise the issue during cross-examination. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [debatable] but admissible evidence.").

Finally, Dr. Harries developed his findings in an impartial and professional manner, which further bolsters its reliability. Dr. Harries originally formed his opinions regarding Dr. Arny's and Dr. Acosta's prescription patterns in two reports for the Kentucky Medical Board. These reports were not prepared at the request of the United States Attorney or for the purpose of testifying in this case. R. 142 at 44. Dr. Harries does not seek out opportunities to testify as an expert witness. *Id.* at 71 ("I don't look for this kind of stuff."). His bottom line is fully supported by the data he reviewed: The gap between Dr. Arny's and Dr. Acosta's conduct and medical norms is large. Since the defendants have not presented any evidence casting the impartiality of Dr. Harries' method, application, or conclusions in doubt, nothing in Rule 702 prohibits Dr. Harries from offering his opinion.

**III.  Dr. Harries's Opinions Do Not Violate Federal Rule of Evidence 703.**

Rule 703 provides that facts and data relied upon by an expert need not be admissible if they are of the type that "experts in the particular field would reasonably rely on . . . in forming an opinion." *See* Fed. R. Evid. 703. Stapleton argues that Dr. Harries' testimony is not protected by Rule 703 because it relies on hearsay from a police investigation report that a doctor would not normally use to judge the medical necessity of the defendants' conduct. *See* R. 45 at 3–4. He further complains that Dr. Harries cannot rely on this report because it was prepared solely for the purpose of litigation. Stapleton and Dr. Harries agree that it is not usually reasonable for doctors to rely on police reports or hearsay from informants. *See*

R. 142 at 45–46. But there is no indication that Dr. Harries actually relied on the investigative report in forming his opinion. While he acknowledged reviewing it in his letters to the Kentucky Medical Board, none of his reasoning draws on the report. None of the secret informants or facts the defendant notes (such as cash seized) are mentioned in his medical analysis. Dr. Harries also expressly disavowed relying on this report. *Id.* at 44 ("The opinion is based upon the notes, any comments the physician has to make, and the KASPER. And that's it."). Merely reading a document does not amount to reliance in the sense relevant to Rule 703, so Stapleton's argument is without merit.

If the defendants' real concern is that the contents of the investigative report might be introduced because of Dr. Harries's testimony, there is no risk of that. Since the report is irrelevant to his opinion, there is no reason for it to come up during direct or cross-examination. Moreover, it cannot be used to bolster Dr. Harries's testimony because experts may not testify that their conclusions are corroborated by the opinions of others. *See Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 409 (6th Cir. 2006) (collecting cases).

**IV.     The Government Has Fulfilled Its Discovery Obligations Under Rule 16(a).**

Stapleton contends that the United States has failed to meet its discovery obligations in two ways. First, he argues that the government has not described the basis for Dr. Harries's testimony with sufficient specificity. Although Stapleton offers no supporting citation, this presumably violates Federal Rule of Criminal Procedure 16(a)(1)(G), which governs expert witnesses. Second, he maintains the government has failed to provide documents that it must disclose. Again, the Court can only presume that Stapleton refers to Federal Rule of Criminal Procedure 16(a)(1)(E), which governs the production of documents.

Rule 16(a)(1)(G) requires the United States to provide defendants "a written summary of any [expert] testimony . . . describe[ing] the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(a)(1)(G). The government violates this rule if a defense expert "would not have been able to analyze the steps that led the government's [experts] to their conclusions." *United States v. Davis*, 514 F.3d 596, 613 (6th Cir. 2008). Federal Rule of Criminal Procedure 16(d)(2)(C) gives the Court discretion to prohibit the introduction of the expert testimony if the government fails to comply with the rule.

Stapleton suggests the government's disclosure does not adequately describe the bases of Dr. Harries's opinion because "[t]here is no indication from Dr. Harries's report whether he reviewed all of the charts or merely selected charts given to him by medical investigators." R. 45 at 4. Defense counsel admits, however, that the government has furnished "a list of charts reviewed by Dr. Harries for the Medical Board," but maintains that "it is not clear if he confin[ed] his opinions to those charts counsel has been furnished with." *Id.*

The record does not support Stapleton's argument. At the very top of Dr. Harries's letters to the Medical Board he explicitly acknowledges that he has reviewed the charts provided. *See* 140-2 at 1; R. 140-3 at 1. In his report on Dr. Acosta he even clarifies, "I base my conclusions on the data reviewed . . . ." R. 140-3 at 1. This strongly suggests *all* the charts *provided*—no more, no less. Dr. Harries also confirmed at the *Daubert* hearing that he based his conclusions on the entire sample of charts the Medical Board provided. *See* R. 142 at 18, 26, 28 (explaining that his reports followed a review of "all the evidence and the

KASPERs and everything else"). As a result, because it is clear which charts form the basis of Dr. Harries' expert opinions, there is no violation of Rule 16(a)(1)(G).

Stapleton also demands a list of Dr. Harries's publications over the last decade, a list of the cases in which he has testified over the same period, and a statement of his compensation. *See* R. 93 at 5. Without citation to authority or much supporting argument, Stapleton tries a unique line of attack. He directs the Court for "guidance" to the more detailed requirements of the analogous rule of *civil* procedure. *See* R. 45 at 5 (quoting Fed. R. Civ. P. 26(a)(2)(B)). This attempted diversion—the legal equivalent of Obi-Wan Kenobi's "These aren't the droids you're looking for," *see* STAR WARS EPISODE IV: A NEW HOPE (Lucasfilm 1977)—is unavailing. "[D]iscovery afforded by Rule 16 is limited to the evidence referred to in its express provisions." *United States v. Presser*, 844 F.2d 1275, 1285 (6th Cir. 1988). The government has already provided Dr. Harries's reports and *curriculum vitae*. *See* R. 87 at 2. Because these documents amply cover his opinions, the bases and reasons for those opinions, and his qualifications, Rule 16(a)(1)(G) is satisfied. The government has thus met its disclosure obligations regarding Dr. Harries' testimony.

Finally, Stapleton argues the United States has breached its disclosure obligations by failing to provide copies of the defendants' medical charts and KASPER reports. This argument misunderstands the government's duties. Rule 16(a)(1)(E) requires the United States to disclose documents "material to preparing the defense" that are "within the government's possession, custody, or control." The federal government accordingly has "no duty to obtain documents that are controlled by the state government or police, even if the prosecution is aware of the items." *United States v. Hamilton*, 107 F.3d 499, 509 n.5 (7th Cir. 1997) (collecting cases). Although it is unclear exactly when, the government has

provided the defendants with the police reports as well as "the medical charts upon which Dr. Harris based his opinions." R. 87 at 2. Stapleton does not contest this in his reply. *See* R. 93 at 5. The government also confirmed the same at the *Daubert* hearing. *See* R. 142 at 35–36. The KASPER reports, on the other hand, are not within the United States' "possession, custody, or control." R. 87 at 2. This, too, is uncontested. *See* R. 93 at 5. Perhaps it is because they are maintained by a state government agency within the Kentucky Cabinet for Health and Family Services. But regardless of the reason, without such access, the federal government has no duty to procure them. Should the United States obtain the KASPER reports, however, a duty of disclosure would arise, since they are plainly material to the defense. Without them, it would be difficult to effectively cross-examine Dr. Harries. Of course, the defendants do not contest that they too can obtain the reports.

## CONCLUSION

For the foregoing reasons, the remaining portion of Stapleton's motion to exclude, R. 45, is **DENIED**.

This the 31st day of July, 2013.

Signed By:
*Amul R. Thapar* AT
United States District Judge