UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAY DOUGLAS STAPLETON, TINA MARIE STAPLETON, and EMMANUEL GALANG ACOSTA,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Criminal No. 12-11-ART-(1),(2),(4)<br><br><br>**MEMORANDUM<br>OPINION AND ORDER** |

*** *** *** ***

The government hopes to introduce a law enforcement narcotics expert to prove that the defendants used their pain clinic to distribute medically baseless prescriptions in violation of federal law. The defendants raised numerous objections, and the government responded by narrowing the scope of the proposed testimony, rendering several of the defendants' arguments moot. After considering the remaining objections, the Court will limit the expert testimony to one subject: the typical features of the drug conspiracies commonly known as "pill mills."

BACKGROUND

The defendants are charged with various drug crimes, including conspiring to illegally distribute oxycodone and other controlled substances. It all started when Kentucky police arrested Ray Stapleton for driving under the influence. R. 158 at 1. Officers searched his car and found over a million dollars in cash and thousands of pills. *Id.* The trail of evidence eventually led the police to the pain clinic that Stapleton and his wife owned and operated.

*Id.* at 1–2.  The government says the Stapletons' pain clinic was the hub of a large drug conspiracy where two doctors issued a high volume of medically baseless prescriptions.  *Id.* These doctors, Dr. Stephen Arny and Dr. Emmanuel Acosta, were employees of the Stapletons.  All four defendants now stand accused of flooding their community with dangerously powerful and addictive drugs.  *Id.*

To prove that the defendants knowingly distributed unnecessary prescriptions, the government seeks to introduce Kentucky State Police Detective Randy Hunter as an expert. His proposed testimony concerns two basic opinions:  1) the amount of pills and cash found in Ray Stapleton's car is consistent with intent to distribute, and 2) the defendants' pain clinic is consistent with the characteristics of a typical "pill mill."  *See* R. 175 at 2.  As defined by Detective Hunter, a "pill mill" is an ostensibly legitimate clinic that unlawfully distributes a large volume of controlled substances without a genuine medical purpose. R. 151-2 at 1.  Hunter summarized the bases of his opinions in a written report provided to the defendants.  *Id.*

Relying on that report, the Stapletons and Dr. Emmanuel Acosta separately moved to exclude Detective Hunter's proposed testimony.  *See* R. 127; R. 133.  The Court then held a *Daubert* hearing to discuss the motions.  *See* R. 164.  At the hearing, the Court ordered new briefing.  *Id.* at 2–3.  And in their renewed motions, the Stapletons and Dr. Acosta raise several objections under Federal Rules of Evidence 702, 703, 704, and 403, as well as the Confrontation Clause.  They argue that Hunter's testimony should be excluded because his opinion is: 1) outside his expertise; 2) irrelevant; 3) unhelpful to the jury; 4) unreliable; 5) based on hearsay, prior bad acts, and the opinions of other experts; 6) an explicit opinion

about the defendants' intent; 7) impermissible "profile" evidence; and 8) otherwise unduly prejudicial. *See* R. 167; R. 168.

The government, for its part, has made key concessions rendering some of these objections moot. First, Detective Hunter will only rely on admissible evidence. *See* R. 175 at 2, 12. As such, he will avoid discussing any of the defendants' prior medical licensing problems, which the prosecution concedes are inadmissible propensity evidence. *Id.* at 12. This initial concession also moots the defendants' objection to Hunter's reliance on hearsay. Second, Hunter will only testify that the evidence is *consistent with* intent to distribute and a typical pill mill. *Id.* at 2. The government originally intended for him to testify that the Stapleton's clinic actually *is* a pill mill, but later walked that back. *Compare* R. 159 at 6, *with id.* at 96–97. This concession moots arguments that Detective Hunter opines directly on the defendants' guilt. And lastly, Detective Hunter will not offer a "medical opinion" or testify as a "medical expert." R. 159 at 32, 42; R. 175 at 2, 4. Hunter admitted that he generally lacks the necessary expertise to reach medical conclusions about the specific treatment practices of the defendants in this case. *See, e.g.*, R. 159 at 44–45. But despite this admission, Hunter will not simply list the characteristics of a typical pill mill. He plans to go further, testifying about what makes particular features of a pain clinic suspicious, including why certain physician behavior is a red flag because it is inconsistent with legitimate pain management. *See id.* at 36–38; R. 175 at 5–7.

## DISCUSSION

After considering the defendants' remaining objections, the Court will limit Detective Hunter's expert testimony to the features pill mills generally exhibit—the pill mill *modus operandi*. For the reasons discussed below, Hunter may not opine on: 1) whether the

defendants' pain clinic exhibits any of those features, 2) why any of those features are inconsistent with legitimate medical treatment, and 3) whether the cash and drugs seized from Ray Stapletons' car is consistent with intent to distribute.

## I.     Detective Hunter May Testify About Typical Pill Mills

Although Detective Hunter's drug enforcement credentials are quite impressive, the defendants raise some legitimate concerns with his testimony about pill mills. Because comparing the defendants' pain clinic to a typical pill mill is unduly prejudicial, Hunter may only discuss pill mills in general. And since Hunter is not a doctor, he lacks the requisite medical expertise to explain why certain physician behavior is inconsistent with legitimate pain management. Detective Hunter is otherwise free to discuss the features law enforcement officers usually find in pill mills.

### A.     Hunter's Testimony About the Usual Features of Pill Mills Satisfies Rule 702

The government may introduce Detective Hunter's expert testimony on the usual characteristics of pill mills. Rule 702 of the Federal Rules of Evidence charges the Court with a "gatekeeping role" in screening expert testimony. *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 668 (6th Cir. 2010) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)). Such testimony satisfies Rule 702 only if it meets three requirements: 1) the witness is qualified, 2) the expert's testimony will assist the jury, and 3) the testimony is reliable. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008). As the proponent of the expert testimony, the government must establish its admissibility by a preponderance of the evidence. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10). Detective Hunter's testimony about the

typical features of pill mills satisfies all three of Rule 702's requirements, and thus may pass through the courthouse gate.

## 1.     Hunter is Sufficiently Qualified

To offer his expert opinion Detective Hunter must be qualified based on his "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Formal training is not necessarily required. *Cf. United States v. Winkle*, 477 F.3d 407, 415–16 (6th Cir. 2007) (finding an employee of an accounting firm with extensive banking experience qualified to testify even though he had no formal accounting education). Repeated firsthand observations may provide a witness the specialized knowledge and experience he needs to testify as an expert. *See Berry v. City of Detroit*, 25 F.3d 1342, 1349–50 (6th Cir. 1994). Whether Detective Hunter's law enforcement experience is sufficient thus depends, at least in part, on "the nature and extent of that experience." *United States v. Cunningham*, 679 F.3d 355, 379 (6th Cir. 2012).

Given Detective Hunter's impressive narcotics credentials, he is amply qualified to discuss the features drug investigators usually find in pill mills. The Stapletons suggest the clinical nature of pill-mill conspiracies makes their inner workings entirely a matter of medical expertise, *see* R. 168 at 7, but Hunter does not need to be a medical expert to know their basic signs. Those signs are well within the competence of law enforcement. The factors relevant to Hunter's qualifications thus include his time as a narcotics investigator, his field experience, and his drug training. *See United States v. Johnson*, 488 F.3d 690, 698 (6th Cir. 2007); *United States v. List*, 200 F. App'x 535, 545 (6th Cir. 2006); *United States v. Anderson*, 89 F.3d 1306, 1312 (6th Cir. 1996). All strongly count in his favor. Hunter has extensive drug training and nearly fourteen years of drug enforcement experience, including

"coordinat[ing] the largest prescription drug round-up" in United States history. *See* R. 151-1 at 1–2; *see also* R. 159 at 15 (discussing 12 years with the KSP Drug Enforcement Section). Assigned to the Appalachia High-Intensity Drug Trafficking Area (HIDTA), his regular duties include "identifying and developing large scale narcotics distributors within the Commonwealth of Kentucky." R. 151-1 at 2. And Hunter is presently leading or consulting on four pill mill investigations in the Eastern District. *Id.* at 3. He is also active in the field, making undercover purchases and working with confidential informants. R. 159 at 15, 23. Detective Hunter even trains other officers in pill mill investigations, and he has lectured locally and nationally on the subject. *Id.* at 19–21. Given this extensive experience, it is not surprising that Hunter has already testified several times as an expert on the illegal distribution of prescription narcotics. R. 151-1 at 4.

Compared to other officers deemed qualified to offer similar expert testimony, Detective Hunter has at least as much law enforcement experience, if not much more. *See Johnson*, 488 F.3d at 698 (approving expert testimony of police officer who "worked on narcotics investigations nearly his entire fourteen-year career"); *Anderson*, 89 F.3d at 1312 (finding an agent with nine years' experience qualified); *United States v. Bender*, 265 F.3d 464, 471–72 (6th Cir. 2001) (approving testimony by an officer who had been with city police department for fourteen years and a member of the vice/narcotics division for nine of those years, had received extensive training in drug crimes and drug trafficking, and had taught classes on drug enforcement and drug interdiction). Hunter's extensive experience thus qualifies him to describe the usual pattern or *modus operandi* of a pill mill. *See United States v. Combs*, 369 F.3d 925, 940 (6th Cir. 2004).

## 2. Hunter's Testimony Will Help the Jury

Since pill mills are designed to appear legitimate, Detective Hunter's testimony will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). As described by the Supreme Court, whether an expert will help the jury is a question going primarily to "relevance." *Daubert*, 509 U.S. at 591. But as used in the context of expert testimony, the term "relevance" has a special, dual meaning beyond its traditional scope. To be relevant for purposes of Rule 702, Detective Hunter's testimony must, of course, relate to an issue in this case. *Id.* This requirement is no more than the basic test of relevance that applies to all evidence. *See* Fed. R. Evid. 401. Beyond that universal requirement, however, Rule 702 also requires that Hunter's expert testimony help the jury evaluate evidence it could not effectively judge on its own. *See* Fed. R. Evid. 702 advisory comm. note (describing the helpfulness test as "whether the untrained layman would be qualified to determine" the issue in dispute without an expert); *see also United States v. Thomas*, 74 F.3d 676, 684 n.6 (6th Cir. 1996) (explaining that expert testimony must concern matters outside "the understanding or common knowledge of the average juror"), *abrogated on other grounds by Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 515 (6th Cir. 1998). Hunter thus may only testify as an expert if lay jurors could not, without assistance, fully piece together the cash, pills, and other possible red flags suggesting intent to distribute and a broader illegal drug conspiracy. *See Thomas*, 74 F.3d at 682.

Testimony about the *modus operandi* of a typical pill mill is relevant to all four defendants. Dr. Acosta disagrees, objecting that the practices of the Stapletons' clinic as a whole or the conduct of his codefendants has no bearing on his guilt because it says nothing about his specific conduct. R. 167 at 7–8; 177 at 4. He suggests Hunter's testimony invites

nothing more than the inference of "guilt-by-association."  R. 167 at 16.  Indeed, if that were

the purpose of his testimony it would be irrelevant and thus inadmissible.  *See United States*

*v. Lopez-Medina*, 461 F.3d 724, 742 (6th Cir. 2006).   But this objection ignores the

government's responsibility to prove the existence of a drug conspiracy.  One way to prove

that conspiracy is by showing that the facts are consistent with the criminal *modus operandi*.

Courts thus routinely find *modus operandi* testimony relevant because it empowers the jury

to make that determination.   *See id.* (holding that expert testimony about "the common

practices of drug traffickers" is relevant); *Thomas*, 74 F.3d at 682 (citing cases).  Although

some of the characteristics described by Detective Hunter may be independently innocuous,

together they suggest an illegal drug scheme.  *See United States v. Stull*, 521 F.2d 687, 691

(6th Cir. 1975).  The government still must prove, of course, that Dr. Acosta voluntarily

joined that scheme, *see United States v. Gibbs*, 182 F.3d 408, 421 (6th Cir. 1999), but

Hunter's testimony is still relevant to whether such a scheme exists in the first place.

Because Detective Hunter's testimony goes to a fact in issue it satisfies the general test of

relevance.

Moreover, Detective Hunter's testimony will help the jury make sense of the evidence

because average jurors are not equipped to spot the seemingly innocent signs of a pill mill.

Expert testimony will only "help the trier of fact" if laymen could not adequately assess the

evidence on their own.   *See* Fed. R. Evid. 702(a) & advisory comm. note.   Common

experience suggests that without expert testimony, typical jurors would miss red flags

suggesting a pain clinic is up to no good.  For example, most of us pay for healthcare using

insurance, so we might find a primarily cash-based clinic odd.  But would you know what

possible inferences you could draw from this oddity?  Would you feel confident concluding

some nefarious scheme was afoot?  Most lay jurors would not have the foggiest idea what to make of an all-cash pain-clinic practice, let alone that it might suggest a unique breed of drug conspiracy.  Likewise, crowds hanging outside a doctor's office might be weird, *see* R. 159 at 35, but then again, maybe they correlate with peak visiting hours.  Given this uncertainty, courts recognize that knowledge of "the methods and techniques employed in an area of criminal activity . . . is generally beyond the understanding of the average layman." *United States v. Pearce,* 912 F.2d 159, 163 (6th Cir. 1990) (internal quotation marks omitted). Average jurors are especially unlikely to appreciate the differences among various types of drug distribution schemes.  *Thomas*, 74 F.3d at 682.  As such, only a law enforcement expert such as Detective Hunter could explain to a jury that regular crowds loitering are suspicious. Since Hunter's testimony about the characteristics of typical pill mills will assist lay jurors to evaluate seemingly innocuous evidence—including nonmedical warning signs—that portion of his opinion is relevant for purposes of Rule 702.

**3.**    **Hunter's Testimony Is Reliable**

Drawing on his wealth of narcotics experience and training, Detective Hunter arrives at his opinion by applying his specialized knowledge to the relevant evidence.  To satisfy Rule 702, both his method and the resulting conclusions must be reliable.  *See Tamraz*, 620 F.3d at 671–72 (rejecting an expert's conclusions as too speculative and attenuated).  In other words, Detective Hunter's opinions must be the product of a reliable application of an otherwise acceptable method.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[C]onclusions and methodology are not entirely distinct from one another. . . . A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

In judging that reliability, the Court usually looks to the *Daubert* factors. *See* 509 U.S. at 593–94. But when evaluating experience-based experts such as Detective Hunter, the *Daubert* factors "cannot readily be applied to measure the reliability of such testimony." *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 295 (6th Cir. 2007). The reliability inquiry in such cases instead tends to "focus upon personal knowledge or experience," *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999), overlapping with analysis of the expert's qualifications. Courts thus often infer from a law-enforcement expert's narcotics credentials that he has reliably applied his specialized knowledge. *See Lopez-Medina,* 461 F.3d at 743 (assessing drug experts' reliability by looking to their "experience and training in investigating narcotics-related crimes"); *see also United States v. Walker*, 657 F.3d 160, 176 (3d Cir. 2011).

Besides Detective Hunter's track record, the Sixth Circuit adds one other relevant factor: whether the expert's findings came out of his independent research or were prepared for the purposes of litigation. *See Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997), *abrogated on other grounds by Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 515 (6th Cir. 1998). Although Hunter's opinion is undoubtedly prepared for the purposes of litigation, that is not enough to cast his entire record into doubt.

Based on Detective Hunter's impressive narcotics experience and training, his application of specialized knowledge about the illegal drug market and the workings of pill mills is reliable. As discussed, Hunter has spent well over a decade in drug enforcement, focusing largely on pill mills. He has field experience and even trains other officers in pill mill investigations. Hunter thus needs no police manual or criminology studies to validate his methodology, as the Stapletons suggest. *See* R. 168 at 4. Since pill mills are Detective

Hunter's primary area of expertise, his specialized knowledge about their signatures and methods gives him a solid basis for discussing their typical characteristics. And while the Stapletons correctly note that some of the features Hunter describes may be vague, *see* R. 168 at 2—for example, the "large volume" of people loitering outside the clinic, R. 151-2 at 3, or the "significant number" of addicted patients, *id.* at 4—these terms represent levels consistent with typical pill mills, as determined by his experience and specialized knowledge. Hunter can flesh them out for the jury during his testimony, and the defendants can test his assertions through cross-examination.

There is also no problem with Hunter's failure to discuss potentially innocent explanations for some of the characteristics he describes, since he is only discussing the features of *typical* pill mills. If the defendants believe his opinion is not strongly probative because their clinic is sufficiently different so as to make the usual red flags unhelpful, they are free to raise these issues on cross examination. Hunter is not opining that every pain clinic displaying these signs actually *is* a pill mill. If the latter were Hunter's opinion, he would indeed have to account for alternative explanations. *See United States v. Seelig*, 622 F.2d 207, 214–15 (6th Cir. 1980) (requiring witness to compare the defendants' pharmacy to those of sufficient size and similarity); *see also* Fed. R. Evid. 702, advisory comm. note (instructing courts to consider "whether the expert has adequately accounted for obvious alternate explanations"). But since Hunter does not go that far, he need not address on direct examination factors that might make the Stapletons' clinic atypical.

**B.     Comparing the Defendants' Clinic to a Typical Pill Mill is Unduly Prejudicial**

Detective Hunter's testimony about the usual features of pill mills is fair game, but his opinion analyzing the Stapletons' pain clinic is "substantially outweighed" by the danger

of unfair prejudice. Fed. R. Evid. 403. The defendants most strongly object that Detective Hunter's expert testimony is inherently prejudicial "profile" evidence, R. 167 at 6–8; R. 168 at 5–6. Courts define profile evidence in different ways, but it boils down to "a listing of characteristics that in the opinion of law enforcement officers are typical of a person engaged in a specific illegal activity." *United States v. McDonald*, 933 F.2d 1519, 1521 (10th Cir. 1991). Although profile evidence is generally disfavored, the label is no magic legal talisman. *See United States v. Long*, 328 F.3d 655, 666 (D.C. Cir. 2003) (explaining that objections to "profile" evidence must be analyzed in terms of the Federal Rules of Evidence); *McDonald*, 933 F.2d at 1522 (same). There is no categorical ban on such testimony. *See United States v. Baldwin*, 418 F.3d 575, 581 (6th Cir. 2005) (discussing permissible uses). The Court therefore must carefully weigh the probative value of Detective Hunter's testimony against its risk of prejudice, taking into account the unique aura of credibility experts and law enforcement carry. *See Lopez-Medina*, 461 F.3d at 744 (noting that jurors may accord law enforcement testimony undue weight); *Brock v. Caterpillar, Inc.*, 94 F.3d 220, 226 (6th Cir. 1996) (noting power of experts to mislead). Still, to justify exclusion the risk of unfair prejudice must overcome Rule 403's presumption of admission. *See United States v. Zipkin*, 729 F.2d 384, 389 (6th Cir. 1984).

Since pill mills are cloaked in the guise of medical legitimacy, Detective Hunter's testimony about their typical *modus operandi* is particularly probative in this case, outweighing the risk of unfair prejudice. Courts frequently permit law enforcement testimony about *modus operandi*. *See Baldwin*, 418 F.3d at 581; *Pearce,* 912 F.2d at 163. When a criminal conspiracy is beyond the competence of lay jurors, the probative value of expert testimony about the typical scheme outweighs the risk of prejudice. *See Long*, 328

F.3d at 666; *White*, 890 F.2d at 1014 (acknowledging risks but recognizing modus operandi exception when area is beyond the competence of lay jurors). The Sixth Circuit for this reason "regularly allows qualified law enforcement personnel to testify on characteristics of criminal activity, as long as appropriate cautionary instructions are given." *United States v. Swafford*, 385 F.3d 1026, 1030 (6th Cir. 2004) (discussing examples). The risk of unfair prejudice is thus not enough to exclude Detective Hunter's testimony about pill mills generally.

Analysis of the Stapletons' clinic justifies exclusion, however, because it unduly risks misuse by the jury. When a law enforcement expert offers a "point by point examination of profile characteristics with specific reference" to the defendant, there is a particularly acute risk the jury will convict simply because the defendant fits the profile. *See United States v. Quigley*, 890 F.2d 1019, 1023–24 (8th Cir. 1989). Since the jury is competent to make the comparison in this case on its own, linking the traits of a typical pill mill to the defendants' clinic carries a significant risk of unfair prejudice without adding much probative value. That risk substantially outweighs whatever minimal probative value Detective Hunter's analysis of the defendants' pain clinic might add. Hunter therefore may not address whether the Stapletons' clinic displays any of the usual characteristics of pill mills. While he is free to discuss pill mills generally, applying that testimony to the facts of this case is up to the jury.

## C.     Detective Hunter Is Not Qualified to Discuss Legitimate Medical Treatment

The typical features of pill mills are well within Detective Hunter's law enforcement expertise, but Hunter is not qualified to discuss why any of those features are inconsistent with legitimate medical treatment. That requires medical expertise. Although Hunter

suggested at the *Daubert* hearing that he has picked up some medical knowledge from his training and experience, *see* R. 159 at 45, 77, as the record currently stands, Hunter does not have the necessary qualifications to describe sound pain management. So, while Hunter is free to describe any nonmedical basis for regarding certain features of a clinic as suspicious, he must leave the rest to the government's medical expert, Dr. Paul Harries. *See* R. 158 (certifying Dr. Harris as a medical expert).

## II.     The Bases of Hunter's Expert Opinion Are Acceptable

The Stapletons and Dr. Acosta argue that Detective Hunter's expert opinion should be excluded because it depends on a variety of allegedly inadmissible evidence and improper sources. The government's response rendered most of these arguments moot, but those that remain lack merit.

## A.     Hunter Will Not Rely on Inadmissible Hearsay or Prior Bad Acts

The evidence the defendants find objectionable falls into two purportedly inadmissible buckets: hearsay and prior bad acts. The defendants first object that Detective Hunter's opinion depends on the truth of several out of court statements. These include statements regarding the source of certain cash, crowds loitering outside the Stapletons' clinic, and Dr. Stephen Arny's treatment patterns. *See* R. 167 at 12–19; R. 168 at 2–3. The defendants also object that reliance on Dr. Acosta's past licensing issues in other states impermissibly introduces evidence of prior bad acts. *See* R. 167 at 20–21; R. 168 at 12–13. The government has already addressed these evidentiary concerns (at least for now) by vowing that Detective Hunter will avoid relying on any inadmissible hearsay or prior licensing troubles of the defendants. *See* R. 175 at 2, 12. And besides, the Court has barred Hunter from testifying about the specific characteristics of the defendants' clinic. So, even

without the government's voluntary limitations, Hunter still would not be able to discuss the contested evidence. As a result, for the purposes of the instant motions at least, the defendants' objections to hearsay and prior acts evidence are doubly moot. Some of their evidentiary objections may later resurface, however, if the government attempts (as it suggests it will) to introduce directly any of the evidence the defendants contend is inadmissible. For example, the prosecution suggests without explanation that some of the contested hearsay is indeed admissible. R. 175 at 12. Although the hearsay and confrontation questions may return, the Court need not hypothetically resolve them all here. The Court will address them when they arise.

## B.     Hunter Does Not Impermissibly Rely on Other Experts

The defendants also object that Detective Hunter's opinion improperly restates and relies on the opinion of Dr. Paul Harries and other medical experts. *See* R. 167 at 13, 19; R. 168 at 8–11. But to the extent this objection concerns any conclusions specifically about the defendants' pain clinic, it is now moot. In order to avoid undue prejudice, the Court has already limited Detective Hunter's testimony to describing the characteristics of typical pill mills. As such, Hunter will not address whether the defendants' clinic actually displays any of those characteristics, and thus he will not simply parrot Dr. Harries.

Dr. Acosta appears to go much further than objecting to reliance on Dr. Harries, however, suggesting that Detective Hunter cannot rely on the conclusions of *any* other expert in forming his own opinion. *See* R. 177 at 6. For example, Dr. Acosta points to Hunter's reliance on the case-specific views of non-testifying medical experts to support his opinion that pill mills generally exhibit certain features. *Id.* If Hunter relied on these conclusions, Acosta claims, he would be merely reiterating the opinions of another expert, which is

prohibited. *Id.* (citing *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 409 (6th Cir. 2007)).

This argument misreads the law. Contrary to Dr. Acosta's reading, *Mike's Train House* and the cases it cites stand for a much narrower proposition: an expert cannot bolster his opinion by showing that a non-testifying expert concurs. *See* David H. Kaye, et al., *The New Wigmore: Expert Evidence* § 4.7.1. Detective Hunter does not do so. He instead relies in part on medical experts encountered throughout his law enforcement career to form a general opinion about the usual features of pill mills. To bar categorically such reliance would prohibit Detective Hunter from relying on a core part of his methodology. It would forbid drawing on any part of his expertise that comes from another expert or even a textbook. Such a rule would essentially require experts to develop expertise based only on their firsthand experience. Dr. Acosta's argument thus proves far too much, for it could result in an infinite regress of experts in search of the original source of specialized knowledge. This would completely undermine the basis of expert testimony. Contrary to Dr. Acosta's argument, the drafters of the Federal Rules specifically contemplated that experts would rely on others with specialized knowledge. *See* Fed. R. Evid. 703 advisory comm. note (noting that a physician might rely on "opinions from nurses, technicians and other doctors"). Since Detective Hunter "would reasonably rely" on the conclusions of non-testifying medical experts he has encountered across his years of training and investigations "in forming an opinion" about the characteristics of pill mills, Hunter may rely on those same experts in this case. *See* Fed. R. Evid. 703. But while Hunter may rely on the observations of medical experts, he still may not describe why any of those observations are inconsistent with legitimate medical treatment because he lacks the requisite medical expertise.

### III. Detective Hunter May Not Testify that the Drugs and Cash Found in Ray Stapletons' Car Are Consistent with Intent to Distribute

Rule 702 does not permit Detective Hunter to explain what the jury can conclude on its own:  that the tremendous amount of drugs and cash found in Ray Stapleton's car are consistent with intent to distribute.  Hunter's long track record of handling drug conspiracies certainly makes him qualified to offer that opinion, and for similar reasons that conclusion would be reliable.  But expert testimony about Stapleton's intent would not help the jury.  True, typical jurors are not familiar with the market for illegal drugs, including the significance of their quantity and prices.  *See Thomas*, 74 F.3d at 682.  For this reason, law enforcement experts routinely "testify that circumstances are consistent with drug distribution rather than personal use."  *Ham*, 628 F.3d at 805 (internal quotation marks omitted).  Yet while jurors may not be familiar with the drug trade, they still have their common sense.

As the case now stands, at least, this is not a borderline situation where the jury might not know what to make of the evidence.  Ray Stapleton was found driving with $1.3 million cash and thousands of pills.  Average jurors know enough about prescription drug abuse to draw the inference that thousands of pills are far more than plausibly carried for personal use.  Since the inference of intent to distribute is natural, even to untrained laymen, evaluating the evidence seized from Ray Stapleton's car is "within the realm of common sense."  *Thomas*, 74 F.3d at 683 (quoting *United States v. French*, 12 F.3d 114, 117 (8th Cir. 1993)).  The government therefore does not need Detective Hunter to explain the obvious.  If Stapleton introduces opinion evidence or the like disputing his intent to distribute—for example, a pharmacist who testifies that Stapleton's behavior is consistent with legal transportation of

prescription drugs—perhaps Hunter's expert testimony will be necessary. For now though, Detective Hunter is limited to testifying about the general characteristics of pill mills.

## IV. The Defendants' Remaining Objections Lack Merit

The defendants raise several other unsuccessful arguments against Detective Hunter's expert testimony. They argue that Hunter's use of the term "pill mill" and his dual role as both fact and expert witness make his testimony unduly prejudicial. *See* R. 167 at 3–4, 24; R. 168 at 11, 13. And by objecting to "profile" evidence, *see* R. 167 at 6–7; R. 168 at 5–6, the defendants also suggest Hunter's testimony is propensity evidence or a direct opinion about their mental state. None of these objections have merit.

## A. Detective Hunter May Use the Term "Pill Mill"

While the term "pill mill" certainly carries a negative connotation, its risk of unfair prejudice is small. To be inadmissible under Rule 403 the term must be more than damaging on account of its probative force; it must encourage the jury to rely on improper considerations, such as emotion. *See United States v. Johnson*, 581 F.3d 320, 327 (6th Cir. 2009); Fed. R. Evid. 403, advisory comm. note (defining "unfair prejudice" as a "tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one"). But even if the risk of improper use by the jury remains small, if an equally effective term carries less risk, the prejudice associated with "pill mill" would still be unfair. *See Old Chief v. United States*, 519 U.S. 172, 184 (1997) (holding that probative value depends in part on alternative evidence available).

Compared to similar drug-related terms, "pill mill" is not especially inflammatory. It is no more pejorative than, say, "drug ring," or "stash house." *See United States v. Hazelwood*, No. 1:10-CR-150, 2011 WL 2565294, at *24 (N.D. Ohio June 27, 2011);

*cf. United States v. Young*, 745 F.2d 733, 760–61 (2d Cir. 1984) (holding that expert testimony about the role that "heroin mills" play and the type of paraphernalia that one would expect to find at such a mill is not unduly prejudicial). As commonly used by law enforcement, the media, and lay people, "pill mill" is merely a shorthand description of a pain clinic that issues medically baseless prescriptions. R. 159 at 43; *see also United States v. Kincaid*, No. 3:10-CR-160, 2013 WL 5595404, at *3 (E.D. Tenn. Oct. 11, 2013); *United States v. Caroni*, No. 3:10-CR-101, 2011 WL 4102343, at *4 (N.D. Fla. Sept. 13, 2011). To be sure, the phrase evokes the prescription drug abuse all too common in Eastern Kentucky, but it fairly captures the type of scheme Detective Hunter describes. *Cf. United States v. Lancaster*, 968 F.2d 1250, 1255 (D.C. Cir. 1992) (holding that use of the term "crack house" was permissible because it corresponded to the conduct at issue). "Pill mill" is not so inflammatory that it would encourage the jury to blame the defendants for the crimes of others. Moreover, the risk of prejudice from the term is exceedingly small in this case because Detective Hunter will testify only about pill mills *generally*; he will not opine that the defendants' clinic is a pill mill or even *consistent with* the typical features of a pill mill. This nearly entirely eliminates the risk of undue prejudice.

Hunter could, as Dr. Acosta suggests, use a more cumbersome definition just to avoid the term "pill mill," *see* R. 167 at 3, but that would add little value. The reduction in prejudice would be marginal at best. Since average jurors are probably generally familiar with this type of drug scheme (though not its particular methods and signs), they will likely make the connection to the term "pill mill" on their own. And besides, whatever minimal prejudice might be avoided is outweighed by the probative value of allowing Detective

Hunter to clearly and succinctly describe his opinion.  As such, the phrase "pill mill" does not meet Rule 403's high bar for exclusion.

**B.      Detective Hunter May Testify in a Dual Role**

The defendants also suggest Randy Hunter's dual testimony as both a fact and expert witness is unduly prejudicial, *see* R. 167 at 24; R. 168 at 13, but nothing suggests the normal precautionary steps would be insufficient in this case.   When a law enforcement officer testifies in a double capacity there is a special risk the jury will confuse the officer's roles and give his testimony undue weight.  *See Lopez-Medina*, 461 F.3d at 744; *Thomas*, 74 F.3d at 682.   Despite this risk, as long as the Court carefully delineates Detective Hunter's separate roles by giving a cautionary instruction, having him testify at two different times, or both, this risk of prejudice is largely mitigated.  *See Lopez-Medina*, 461 F.3d at 743–44.  Any risk of unfair prejudice remaining after these precautions is not substantial enough to outweigh—let alone *substantially* outweigh—the significant probative value of Detective Hunter's expert testimony.

**C.      Remaining Objections Based on "Profile" Testimony Fail**

Beyond the risk of undue prejudice, other potential objections to so-called "profile" testimony are not a problem here.  Based on the various common uses of the profile label, the defendants' objection might also suggest Detective Hunter's testimony is inadmissible because it is impermissible propensity evidence, *see Baldwin*, 418 F.3d at 581, or because it is a direct opinion about the defendants' mental state, *Combs*, 369 F.3d at 940.   Hunter's testimony suffers from neither flaw.

**Propensity Evidence:** The relevance of Detective Hunter's testimony does not depend on impermissible propensity-based reasoning.  The red flags Hunter describes are not

introduced to establish that the defendants have the character of those who operate pill mills and therefore that they were operating a pill mill here. That would be propensity reasoning. *See* Fed. R. Evid. 404(a)(1) ("Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."). Instead, Detective Hunter's testimony is designed to show that certain features that might seem innocuous are actually circumstantial evidence of a pill mill itself. The jury need not rely on any propensity inference to apply Hunter's opinion to the defendants' clinic.

**The Defendants' State of Mind:** Detective Hunter's testimony expressly stops short of directly opining about the defendants' state of mind. An expert may not explicitly state an opinion or an inference on whether the defendant did or did not have a culpable mental state. *See* Fed. R. Evid. 704(b). Hunter will avoid that pitfall because he is limited to discussing only the characteristics of typical pill mills. *See Swafford*, 385 F.3d at 1030; *Combs*, 369 F.3d at 940. There is thus no violation of Rule 704(b) because Hunter "simply describe[s] in general terms the common practices of those who clearly do possess the requisite intent, leaving unstated the inference that the defendant, having been caught engaging in more or less the same practices, also possessed the requisite intent." *Combs*, 369 F.3d at 940 (internal quotation marks omitted); *see also United States v. Dunn*, 846 F.2d 761, 762 (D.C. Cir. 1988) (expert's testimony that quantities of drugs, drug packaging material, drug paraphernalia and weapons indicate a retail drug operation did not violate Rule 704(b)).

## CONCLUSION

For the reasons stated in this opinion, the defendants' motions to exclude are **GRANTED IN PART** and **DENIED IN PART**.

This the 8th day of November, 2013.

Signed By:

*Amul R. Thapar*

United States District Judge